UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:12-20317-CIV-Lenard/O'Sullivan

TV Service ZAO, a closed Joint
Stock Company organized under
the laws of the Russian Federation,

        Plaintiff/Counter-Defendant,

vs.

NWE Talent Agency and
Management, Inc., d/b/a NWE
Talent Agency and Management
Company, a Florida Corporation, et al.,

        Defendants/Counter-Plaintiffs.

_____/

**PLAINTIFF/COUNTER-DEFENDANT'S MOTION FOR SUMMARY**
**JUDGMENT AND INCORPORATED MEMORANDUM OF LAW**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, and S.D. L.R. 56.1, Plaintiff/Counter-Defendant, TV SERVICE ZAO ("TV Service"), by and through its undersigned counsel, DLA PIPER LLP (US), hereby moves for final summary judgment against Defendants/Counter-Plaintiffs, NWE TALENT AGENCY AND MANAGEMENT, INC. ("NWE"), RYAN BURKE ("Burke") and VISION ENTERTAINMENT WORLDWIDE ("VEW") (NWE, Burke and VEW are collectively referred to herein as the "Burke Entities") with respect to the one-count breach of contract Counterclaim filed by the Burke Entities (the "Counterclaim"), and in support thereof TV Service states as follows:

## PRELIMINARY STATEMENT

After being blatantly defrauded out of approximately $1,650,000.00 in connection with TV Service's efforts to secure the performance of "Lady Gaga" for its annual music awards show which is held in Moscow, Russia, TV Service filed its Complaint against the Burke Entities[1] seeking to recover damages, including the immediate return of $1,650,000.00.  See Complaint.  As reflected in the Complaint, TV Service asserts claims against the Burke Entities for fraud, unjust enrichment, and conversion.  Id.

In an effort to deflect attention from their own wrongdoing and to impede TV Service's good faith efforts to recover the monies wrongfully misappropriated by the Burke Entities, the Burke Entities responded to the Complaint by filing a *facially defective* (and convoluted) one-count Counterclaim, wherein the Burke Entities attempt to fabricate some sort of amorphous "breach of contract" claim against TV Service.  See Counterclaim and Exhibits 1-4 attached thereto.  As reflected in the Counterclaim, in a strained effort to manufacture a breach of contract counterclaim against TV Service, the Burke Entities erroneously rely upon four (4) documents (attached to the Counterclaim) which actually serve to directly negate the Burke Entities' efforts to assert a breach of contract counterclaim.  Id.  In the Counterclaim, the Burke Entities include sparse and internally inconsistent allegations regarding TV Service's purported breach of certain unspecified material terms from a non-existent agreement, and the Burke Entities seek to recover $1,350,000.00 as "liquidated damages" from TV Service.  Id.

With respect to the Burke Entities' flawed Counterclaim, the true dispositive question is not whether TV Service breached a term of a contract (which it did not), but whether an enforceable contract existed at all between the Burke Entities and TV Service.  Significantly,

---

[1] The Complaint was also filed against Defendants George Sergeev ("G. Sergeev") and World Media Alliance, Inc. ("WMA").  On June 14, 2012, the Court entered a Final Default Judgment against G. Sergeev and WMA. See Order (D.E. 63)

based upon the undisputed facts, the face of the relevant documents and Burke's own testimony, the answer to that dispositive question is <u>no</u> -- there is clearly no enforceable contract between the Burke Entities and TV Service which can support any viable counterclaim against TV Service. The Counterclaim must therefore be dismissed in its entirety.

Additionally, as explained herein, TV Service is also entitled to the entry of summary judgment dismissing the Counterclaim because: (i) the Burke Entities' improper claim for retention of the $1,350,000.00 as "liquidated damages" fails, as a matter of law, as an improper and unreasonable penalty; and (ii) the record is clear that the Burke Entities were illegally operating as an unlicensed talent agency, and the governing law dictates that such an unlicensed talent agency is not entitled to retain any monies obtained in connection with the flawed and unsuccessful efforts to book Lady Gaga.

Accordingly, for the reasons set forth herein, final summary judgment should be entered in favor of TV Service and against the Burke Entities with respect to the Burke Entities' baseless and defective Counterclaim, and this Court should enter an order dismissing the Counterclaim with prejudice, and ordering that the $1,050,000.00 of TV Service's monies currently being held in a frozen bank account pursuant to this Court' Order (the "Frozen Funds")[2] be immediately released and returned to TV Service.

---

[2] On January 31, 2011, the Court entered its Order Granting Joint Motion to Freeze Funds in Escrow Account  (D.E. 6). <u>See</u> Order.

## <u>STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

***The TV Service Entity And The Annual MUZ-TV Music Awards***

1.      TV Service is a wholly owned subsidiary of UTH Russia Limited ("UTH"), and two of UTH's main assets are MUZ-TV, a free Russian music TV channel modeled after MTV in the United States, and a fifty-one percent (51%) interest in the Disney channel in Russia. <u>See</u> Declaration of Arman Davletyarov of TV Service  ("Arman Dec.") at ¶ 4 attached hereto at **<u>Exhibit 1</u>**. Since 2003, TV Service has presented the nationally televised MUZ-TV Music Awards Show ("MUZ Awards"), which is held annually in Moscow, Russia during the month of June. <u>Id</u>. at ¶ 5.  One of the highlights of the annual MUZ Awards is a performance by a major international recording artist, and performers in past years have included Christina Aguilera, Jennifer Lopez, Katy Perry and 50 Cent, among others.  <u>Id</u>.

2.      In or about August 2011, TV Service representatives wanted to coordinate the booking of an appearance and show by the artist known as "Lady Gaga" for the MUZ Awards to take place in Moscow, Russia on June 1, 2012, at the Olimpiyski Arena. <u>Id</u>. at ¶6.

***Burke And The Burke Entities***

3.      Burke is the president of VEW, a Florida corporation holding itself out as operating a full service entertainment company and talent agency. <u>See</u> Counterclaim at ¶¶ 4-5; <u>see also</u> Deposition of Ryan Burke[3] ("Burke Dep.") at 45:15-46:8; <u>see also</u> VEW website attached hereto at **<u>Exhibit 3.</u>**  Burke is also a "designated agent" and "senior booking agent" for NWE which also holds itself out as operating a "full service" talent agency and entertainment company.  <u>See</u> Counterclaim at ¶¶ 3, 5; <u>see also</u> Burke Dep. at 19:16-18;  69:22-70:3; NWE website attached hereto at **<u>Exhibit 4.</u>**

---

[3] The portions of Burke's Deposition transcript cited in this Motion are attached hereto at **<u>Exhibit 2.</u>**

4.     Burke, nor his companies, NWE and VEW, are licensed talent agencies pursuant to Florida Statute Section 468.403.  See Fla. Stat. § 468.403; see also Florida Department of Business & Professional Regulation,  http://www.myfloridalicense.com/dbpr/ (then "unlicensed activity"; then "verify a license") (last visited November 27, 2012).

5.     VEW lists its principal place of business as 1395 Brickell Avenue, Suite 800, Miami, Florida 33131.  See Burke Dep. at 41:16-19; see also VEW website.  Neither Burke nor any other representative of VEW works or has ever worked at this physical address, and Burke has never been to this purported "principal place of business."  See Burke Dep. at 10:11-11-19.  VEW's address for its principal place of business is a "virtual office" which Burke established to give the appearance that the company had physical office locations.  Id.  NWE lists its principal place of business as 1680 Michigan Avenue, 700, Miami Beach Florida, 33139.  See Burke Dep. at 76:18-25; see also NWE website.  As with VEW,  NWE's address for its principal place of business is a "virtual office."  See Burke Dep. at 76:18-77:5; 78:17-79:13.

6.     In order to create the appearance that NWE and VEW are distinct corporate entities, Burke listed his mother, Juliet Sucki, as the president of NWE.  See Burke Dep. at 70:19-71:14.  In reality, Juliet Sucki is a mere "figurehead" for NWE.  Id. at 74:18-75:7.  Burke is the controlling member and corporate representative of NWE and VEW. Id. at 18:25-19:15; 71:9-14.

***George Sergeev And His World Media Alliance Company***

7.     George Sergeev ("G. Sergeev") is the president of World Media Alliance, Inc. ("WMA"), a Florida corporation, holding itself out as operating a music label.  See Counterclaim at ¶¶ 6-7; see also Burke Dep. at 109:19-24.

***Lady Gaga And Her Exclusive Authorized Representatives***

8.     Lady Gaga is a world famous and very successful recording artist and singer.  See Deposition of Troy Carter[4] ("Carter Dep.") at 17:8-12.  Since 2007, Troy Carter has served as Lady Gaga's exclusive manager, in which he handles all aspects of Lady Gaga's career, including her music, tours, partnerships, etc. See Carter Dep. at 25:21-27:18.  Since 2009, William Morris Endeavor Entertainment, LLC ("William Morris") has been the exclusive booking/talent agent for Lady Gaga. Id. at 24:23-25:16; 29:1-17.  As Lady Gaga's exclusive booking/talent agent, William Morris is responsible for booking Lady Gaga for concerts and performances. Id. at 24:23-25:16; 28:16-29:17.

9.     Prior to January of 2012 (and at any time thereafter), Burke and his companies, NWE and VEW, and G.Sergeev/WMA had never worked with Lady Gaga, were never authorized representatives of Lady Gaga and had never secured her as a performer on anyone else's behalf.  See Burke Dep. at 123:20-22; see also Carter Dep. at 31:3-10; 34:3-35:8.

10.     In or around mid-August of 2011, after being informed that TV Service was interested in booking Lady Gaga to perform at the MUZ Awards in Moscow, Russia on June 1, 2012, G. Sergeev stated that he could arrange for the requested performance of Lady Gaga on June 1, 2012 at the MUZ-TV Awards Show.  See Arman Dec. at ¶ 8.  Also, in or around mid-August of 2011, Burke informed G. Sergeev that he could use his relationship with Troy Carter to secure Lady Gaga for the MUZ Awards on June 1, 2012, and would need a deposit, also known as a "binder," before engaging in any negotiations to secure Lady Gaga.  See Burke Dep. at 153:8-155:8; 156:21-25; 157:16-158:6.

11.     On August 23, 2011, G. Sergeev's company, WMA, and Burke's company, NWE, entered into a "Binder Agreement/Intent to Engage Talent (hereinafter referred to as "WMA/NWE Binder Agreement").  See WMA/NWE Binder Agreement attached hereto at

[4] The portions of Troy Carter's Deposition transcript cited in this Motion are attached hereto at **Exhibit 5.**

**Exhibit 6**.   Under the WMA/NWE Binder Agreement, WMA was directly engaging NWE to "act on its behalf" to secure the services of Lady Gaga, and WMA agreed to pay NWE a binder deposit in the amount of $150,000.00, which was to be "placed into the Escrow Account at NWE Talent Agency & Management, Inc." Id.

12.     The WMA/NWE Binder Agreement provided that the total Agent/Booking Fee(s) and Broker Fee(s), if any, for NWE was $300,000.00.  See WMA/NWE Binder Agreement; see also Burke Dep. at 163:16-164:20.   The WMA/NWE Binder Agreement further provided that "[a]ll funds received in escrow at NWE Talent & Management, Inc. shall be fully refundable should the following occur: ARTIST and/or ARTIST's Management and/or Agent(s) does not accept your offer" or "negotiations do not end in fully executed contract(s)." See WMA/NWE Binder Agreement.

13.     TV Service is not a party to the WMA/NWE Binder Agreement, and had no obligations under the WMA/NWE Binder Agreement. See WMA/NWE Binder Agreement; see also Arman Dec. at ¶ 10.  TV Service did not agree to engage NWE under the WMA/NWE Binder Agreement, and TV Service did not agree to pay any monies to NWE under the WMA/NWE Binder Agreement. Id. at ¶ 11.  At the time that the WMA/NWE Binder Agreement was entered into between WMA and NWE, TV Service had no agreement with G. Sergeev/WMA, and G. Sergeev/WMA had no authority to act on behalf of TV Service for any purpose. See WMA/NWE Binder Agreement; see also Burke Dep. at 175:7-176:3; Arman Dec. at ¶ 12.

14.     The WMA/NWE Binder Agreement provided that a binder in the amount of $150,000.00 "shall be placed into the Escrow Account." See WMA/NWE Binder Agreement. NWE received the $150,000.00 binder/deposit from G. Sergeev/WMA pursuant to the

WMA/NWE Binder Agreement. <u>See</u> Burke Dep. at 167:6-9; 283:8-12.  NWE did not hold the $150,000.00 binder/deposit in escrow.  <u>See</u> Burke Dep. 168:12-25; 170:2-13; 323:21-324.3. Rather, Burke utilized the monies for his personal benefit.  <u>Id.</u>

15.     Thereafter, in or about September 2011, based upon the series of false representations made by G. Sergeev, TV Service was induced to enter into a binder agreement/intent to engage talent agreement directly with G. Sergeev and his company, WMA (the "WMA/TV Service Binder Agreement"). <u>See</u> Arman Dec. at ¶ 13 ; <u>see also</u> WMA/TV Service Binder attached hereto at **<u>Exhibit 7</u>**.

16.     None of the Burke Entities are parties to the WMA/TV Service Binder Agreement, and TV Service has no obligations to any of the Burke Entities under the WMA/TV Service Binder Agreement. <u>See</u> WMA/TV Service Binder; <u>see also</u> Burke Dep. at 236:10-237:3; Arman Dec. at ¶ 14.

17.     Under the WMA/TV Service Binder Agreement, TV Service engaged WMA to "enter into negotiations ***<u>with Artist and/or Artist's Management and/or Agent(s)</u>***, for the above mentioned Engagement date(s)." <u>See</u> WMA/TV Service Binder Agreement (emphasis added). G. Sergeev and his company, WMA, were never authorized to enter into agreements and/or negotiations with unauthorized representatives/agents of Lady Gaga on behalf of TV Service. <u>See</u> Arman Dec. ¶ 17.

18.     The purpose of the WMA/TV Service Binder Agreement was for WMA to obtain a binder/deposit from TV Service in the amount of $300,000.00 before it moved forward with "enter[ing] into negotiations" with Lady Gaga and/or her authorized representatives/agents to secure Lady Gaga to perform at the MUZ Awards on June 1, 2012 in Moscow, Russia. <u>See</u> WMA/TV Service Binder Agreement. Pursuant to the WMA/TV Service Binder Agreement, the

total "Guarantee & Compensation" that could be offered to Lady Gaga by WMA for the proposed performance was "$1,500,000.00 USD Plus All Expenses." <u>See</u> WMA/TV Service Binder Agreement. The WMA/TV Service Binder Agreement further provided that "[a]ll funds received in escrow at World Media Alliance, Inc. shall be fully refundable should the following occur: "ARTIST and/or ARTIST's Management and/or Agent(s) does not accept your offer till October 30, 2011" or "negotiations do not end in fully executed contract(s) or negotiations towards a formal agreement memorializing the terms of the above referenced Engagement(s)." <u>See</u> WMA/TV Service Binder Agreement.

19.     TV Service sued WMA/G. Sergeev for breach of the WMA/TV Service Binder Agreement and, on June 14, 2012, the Court entered a Final Default Judgment against G. Sergeev and his company, WMA. <u>See</u> Order (D.E. 63).

***The Unexecuted, Non-Final and Non-Binding Proposed Artist Engagement Documents***

20.     During the process of purportedly securing Lady Gaga for the performance at the MUZ Awards on June 1, 2012, the Burke Entities provided G. Sergeev/WMA and TV Service with a number of different proposals with varying concepts and material terms for purposes of the proposed "Artist Engagement Agreement" which was to be proposed to Lady Gaga and Lady Gaga's authorized representatives. <u>See</u> Arman Dec. at ¶ 18; <u>see also</u> Burke Dep. at 203:4-13; Counterclaim at Exhibits 3 & 4. The various proposed "Artist Engagement Agreements" and non-binding proposals were prepared with the intention of sending them to Lady Gaga's authorized representatives for review and possible approval. <u>See</u> Burke Dep. at 203:4-13; 205:9-206:11; <u>see also</u> Arman Dec. at ¶ 19.  The proposed agreements required specific approval and acceptance by Lady Gaga and/or one of her authorized representatives, such as William Morris or Troy Carter. <u>Id.</u>

21.    With respect to one such proposed "Artist Engagement Agreement," unbeknownst to TV Service, the Burke Entities created a new version of a proposed artist engagement proposal dated December 16, 2011 (hereinafter referred to as "12/16 Proposal").  <u>See</u> 12/16 Proposal attached hereto at **<u>Exhibit 8;</u>** Burke Dep. 244:11-18; Arman Dec. at ¶ 21.  The 12/16 Proposal contained certain new proposed terms that had never been discussed with TV Service, and it generally provided that Lady Gaga would perform at the MUZ Awards for the price of "$2,300,000.00 USD Plus All Expenses."  <u>See</u> 12/16 Proposal.

22.    According to Burke's own testimony, the 12/16 Proposal was not an "operative" agreement and would not be an operative document until Lady Gaga, William Morris, Troy Carter or an authorized representative of Lady Gaga signed the 12/16 Proposal under the signature line titled "authorized signatory."  <u>See</u> 12/16 Proposal; <u>see also</u> Burke Dep. at 226:1-228:3; Carter Dep. at 54:14-24; Arman Dec. at ¶ 19.  The 12/16 Proposal was not signed or entered into by Burke, NWE or VEW. <u>See</u> 12/16 Proposal; <u>see also</u> Burke Dep. 246:17-21.  The 12/16 Proposal was not signed or entered into by Lady Gaga or any authorized representative of Lady Gaga. <u>See</u> 12/16 Proposal; <u>see also</u> Burke Dep. at 246:17-21; Carter Dep. at 50:19-52:6.

23.    The 12/16 Proposal was not signed by any authorized representative of TV Service, and TV Service was never provided with a copy of the 12/16 Proposal until after the litigation in this case was commenced. <u>See</u> 12/16 Proposal; <u>see also</u> Arman Dec. at ¶ 22.  The 12/16 Proposal is not a binding or enforceable agreement.  <u>See</u> Burke Dep. at 226:1-228:3; <u>see also</u> Arman Dec. ¶ 24.  As of the date Burke prepared the 12/16 Proposal, Burke had not had any meetings or discussions with Troy Carter regarding the proposed booking of Lady Gaga for the MUZ Awards, and neither Burke nor any of his companies had the authority to enter into any agreements on behalf of Lady Gaga.  <u>See</u> Carter Dep. at 49:3-52:6.  The 12/16 Proposal was

never approved or signed by Lady Gaga or any of her authorized representatives.  See Burke Dep. 246:17-21; 248:20-249:2; see also Carter Dep. at 50:19-52:6; Arman Dec. ¶ 24.

24.     In an effort to induce TV Service to wire $1,350,000.00 to the Burke Entities to purportedly be deposited in an escrow account, Burke sent e-mail correspondence to TV Service representatives stating that "[a]fter speaking with NWE Talent [the company Burke actually controls], they have decided to terminate any and all further negotiations with Lady Gaga." "they've already entered into negotiations with the Artist," and "[t]hey state the funds MUST be in escrow no later than end of business on Tuesday, December 27, 2011."  See 12/23/11 E-mails attached hereto at **Exhibit 9.**

25.     In the email correspondence, Burke also stated that the "the funds were going DIRECTLY to NWE Talent who would them forward to her [Lady Gaga's] Management/Agent a deposit, that way they would know that it's real people they are dealing with." Id. Lady Gaga's management had never demanded that any monies be paid from TV Service to NWE.  See Burke Dep. at 336:17-337:6; see also Carter Dep. 59:8-60:6.  In fact, prior to January 2012, neither Lady Gaga, Troy Carter nor any other authorized agent of Lady Gaga were engaged in any negotiations with Burke or his companies in connection with the MUZ Awards.  See Carter Dep. at 58:24-60:6; 297:21-298:7.

26.     In reliance upon Burke's statements, on or about December 27, 2011, TV Service wired $1,350,000.00 to what it believed to be NWE's ***escrow*** account at J.P. Morgan Chase Bank in Fort Lauderdale, Florida.  See Acknowledgment of Receipt attached hereto at **Exhibit 10;** see also Arman Dec. at ¶ 23.

27.     After Burke was made aware that Lady Gaga would not agree to perform on June 1, 2012, and would not agree to any performance on the terms reflected in the 12/16 Proposal, on

or about January 18, 2012, Burke sent G. Sergeev another new, proposed "Artist Engagement Agreement" dated January 10, 2012, with entirely different proposed material terms ("1/10 Proposal"). See 1/10 Proposal attached at **Exhibit 11;** see also Counterclaim at Exhibit 4.

28.     The 1/10 Proposal was only signed by Kimone Love of NWE, who is Burke's cousin who had never previously worked in the entertainment industry, but was briefly given the title as Chief Operating Officer of NWE from January 2012 to June 2012.  See 1/10 Proposal; see also Deposition Transcript of Kimone Love[5] at Dep. at 24:22-24; 25:7-25; Burke Dep. at 86:24-87;4. Neither Kimone Love, nor anyone at NWE or any of the Burke Entities were authorized representatives of Lady Gaga or authorized to enter into any agreements on behalf of Lady Gaga. See Carter Dep. at 82:23-83:5; 84:25-85:2.  According to Troy Carter's testimony, neither he nor Lady Gaga accepted any of the prior proposals from TV Service, including the 1/10 Proposal for a performance date in October.  See Carter Dep. at 81:8-11; 81:18-20; see also Arman Dec. at ¶ 24.  Troy Carter never authorized Burke nor anyone from NWE to make an offer for Lady Gaga to perform in the amount of $3.5 million.  See Carter Dep. at 82:23-83:5.

29.     The 1/10 Proposal was not signed or accepted by any TV Service representative, and TV Service did not agree to any of the proposed terms in the 1/10 Proposal. See 1/10 Proposal; see also Arman Dec. at ¶ 25. The new 1/10 Proposal proposed that Lady Gaga would appear for a performance on ***October 9, 2012*** (more than 4 months after the June 1, 2012 date of the MUZ Awards), and that the compensation would be ***$3.5 million***.  See 1/10 Proposal.

30.     In response to the 1/10 Proposal, G. Sergeev wrote Burke: "Date MUZ TV need June 1, all deal is impossible and unacceptable." See 1/18/12 e-mail attached at **Exhibit 13.**  On January 20, 2012, Andrey of TV Service sent Burke an e-mail in response to the 1/10 Proposal requesting an immediate return of the $1,650,000.00 paid in connection with the engagement.

---

[5] The portions of Kimone Love's Deposition transcript cited in this Motion are attached hereto at **Exhibit 12.**

See 1/20/12 E-mail attached hereto at **Exhibit 14;** In his e-mail, Andrey also stated that "I've never asked you or anyone else to change the date of MUZ TV ceremony awards from June 1 to Oct 9. . . [a]nd of course I would never accept a unilateral increase of the booking price from $2,500,000 USD to $3,500,000 USD." See 1/20/12 E-mail.

***The Instant Lawsuit and The Burke Entities' Flawed Counterclaim***

31.     After repeated attempts to obtain a return of the monies, TV Service filed its Amended Complaint (the "Complaint") against G. Sergeev, WMA, Burke, NWE and VEW seeking a full return of the $1,650,000.00. See Complaint. On or about January 31, 2012, the Burke Entities and TV Service filed a Joint Motion to Enter an Order Freezing Funds in Escrow Account (the "Joint Motion").   See Joint Motion (D.E. 5).   NWE undisputedly received $1,500,000.00 of TV Service's funds, and only $1,050,000 remained in NWE's bank account as of January 31, 2012. See Joint Motion (D.E. 5).   On January 31, 2012, the Court entered its Order Granting Joint Motion to Freeze Funds in Escrow Account. See Order (D.E. 6).

32.     On March 12, 2012, Counter-Plaintiffs filed a one count breach of contract Counterclaim against TV Service. See Counterclaim. The Counterclaim purports that TV Service violated an unspecified exclusivity term and that a "[v]iolation of this term was a material breach of the contracts between TV Service, VEW, WMA, Burke and NWE." Id. at ¶ 16.  Moreover, the Burke Entities allege that as a result of TV Service's purported breach, "any monies presently in escrow should be forfeited to the Counter-Plaintiffs." Id.  The Burke Entities demand "judgment for liquidated damages of $1,350,00 compensation and punitive damages." See Counterclaim. Burke testified that he would have only made a profit of "on or around $300,000.00" and the other monies received were going directly to Lady Gaga. See Burke Dep. 284:11-285:2; 322:22-323:6.

## MEMORANDUM OF LAW

## I. STANDARD OF REVIEW

Fed. R. Civ. P. 56 provides in relevant part that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56. Summary judgment is appropriate "where the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Trustees of Central Pension Fund of Int'l Union of Operating Engineers and Participating Employers v. Wolfcrane Service, Inc., 374 F.3d 1035, 1039 (11th Cir. 2004).

Furthermore, in cases such as this, where the undisputed facts establish that no enforceable contract exists between the parties, summary judgment is properly granted with respect to the breach of contract claims. See Irby v. Memorial Healthcare Group, Inc., 901 So. 2d 305, 305 (Fla. 5th DCA 2005) (affirming trial court's summary judgment in breach of contract action where the undisputed facts show that there "was not an enforceable contract"); see also Green v. Fedex National, LTL, Inc., No. 8:09–cv–445–T–33TBM, 2011 WL 6813458 at * 4 (M.D. Fla. Dec. 28, 2011) (granting summary judgment on grounds there that "there is no enforceable contract in this case").

## II. LEGAL ARGUMENT

1. ***There Is No Valid Contract Entered Into Between TV Service And The Burke Entities, And The Burke Entities Cannot Assert Any Viable Breach of Contract Counterclaim Against TV Service Under Any of The Documents And Agreements Attached to The Counterclaim***

At the outset, the law is clear that the elements required to state a valid breach of contract claim are: (1) *a valid contract*; (2) a material breach; and (3) damages. Beck v. Lazard Freres &

Co., LLC, 175 F.3d 913, 914 (11th Cir.1999) (emphasis added).  In the absence of a valid and enforceable contract between the parties, the claim for breach is subject to dismissal as a matter of law.  See Irby v. Memorial Healthcare Group, Inc., 901 So. 2d at 305; see also Maultsby ex rel. Maultsby v. Senior Living Mgmt., No. 8:09-cv-2037-T-30EAJ., 2010 WL 1408428 at *3 (M.D. Fla. Apr. 5, 2010) ("Because there can be no breach without a valid contract, Count Two is dismissed."); Business Radio, Inc. v. Relm Wireless Corp., 373 F. Supp. 2d 1317, 1320 (M.D. Fla. 2005) (granting defendant's motion to dismiss and holding that no agreement had been reached on essential terms and an enforceable contract could not exist).

As set forth above, in an effort to fabricate some sort of breach of contract counterclaim against TV Service, the Burke Entities attached four (4) separate documents to the Counterclaim and desperately attempted to cobble together a viable breach of contract claim.  However, as explained herein, the record is clear that none of the four (4) documents constitute a valid contract between the Burke Entities and TV Service, and the Burke Entities have absolutely no basis to support a breach of contract counterclaim against TV Service.  Specifically, the undisputed record evidence (and the face of the relevant documents) establish that: (i) TV Service is **_not a party_** to the WMA/NWE Binder Agreement, TV Service has no obligations to the Burke Entities under such agreement, and the Burke Entities cannot sue for breach of such agreement; (ii) the Burke Entities are not parties to WMA/TV Service Binder Agreement, TV Service has no obligations to the Burke Entities under such agreement, and the Burke Entities cannot sue for breach of such agreement; (iii) the 12/16 Proposal is undisputedly a non-final proposal, does not constitute an enforceable contract and was not executed or agreed to by any authorized representative of Lady Gaga or any authorized representative of TV Service; and (iv) the subsequent 1/10 Proposal is also undisputedly a non-final proposal, does not constitute an

enforceable contract and was not executed or agreed to by any representative of TV Service or any authorized representative of Lady Gaga.

**1.**      ***The Burke Entities Cannot Assert Any Viable Breach of Contract Claim Against TV Service Under The WMA/NWE Binder Document***

With respect to the WMA/NWE Binder Agreement dated August 23, 2011 (attached to the Counterclaim as Exhibit 1), the face of the agreement makes it clear that it is an agreement between G. Sergeev/WMA and the Burke Entities, and that TV Service is not a party to that agreement.  See WMA/NWE Binder Agreement.

With respect to the WMA/NWE Binder Agreement, Burke testified that he understood that he was "dealing **directly** with George Sergeev and his company."  See Burke Dep. at 174:4-17 (emphasis added).  Furthermore, in response to a question regarding Burke's knowledge of any relationship between G. Sergeev and TV Service at the time WMA/NEW Binder Agreement was entered into, Burke responded that: "I don't think I knew anything about the [sic] TV Service at that time."  Id. at 174:18-175:3.  In fact, the WMA/NWE Binder Agreement was entered into between WMA and NWE even ***before*** TV Service had entered into any contractual relationship with G. Sergeev/WMA (the WMA/TV Service Binder Agreement was not entered into until August 28, 2011).  See WMA/TV Service Binder Agreement; see also Arman Dec. at ¶ 12; Burke Dep. at 175:23-25.

Accordingly, the undisputed facts are clear that TV Service is not party to the WMA/NWE Binder Agreement, and that TV Service had no contractual obligations to the Burke Entities under such agreement. See Burke Dep. at 174:25-175:3; see also Arman Dec. at ¶ 10. As such, TV Service certainly cannot be liable for any purported breach of this agreement, and the Burke Entities cannot rely upon such agreement to support any breach of contract counterclaim. See Morgan Stanley DW, Inc. v. Halliday, 873 So. 2d 400, 403 (Fla. 4th DCA

2004) ("Unless a person is a party to a contract, that person may not sue—or, for that matter, be sued—for breach of that contract where the nonparty has received only an incidental or consequential benefit of the contract."); see also Whetstone Candy Co. v. Kraft Foods, Inc., 351 F.3d 1067, 1073 (11th Cir. 2003) ("[g]enerally, a contract does not bind one who is not a party to the contract, or who has not in some manner agreed to accept its terms").

In addition to the undisputed fact that TV Service is not a party to the WMA/NWE Binder Agreement, under the terms of the WMA/NWE Binder Agreement, the only amount to be paid to NWE from WMA was the amount of $150,000.00 consisting of a portion of the total of $300,000.00 in potential broker fees.  See WMA/NWE Binder Agreement.  The undisputed facts establish that NWE was fully paid the $150,000.00 pursuant to this agreement, and the undisputed record evidence establishes that the Burke Entities have no viable basis for any breach claim.[6]  See Burke Dep. at 167:6-9.

Finally, as stated above, in their Counterclaim, the Burke Entities are seeking to recover substantial "liquidated damages" against TV Service in the amount of $1,350,000.00, and the WMA/NWE Binder Agreement does not contain any "liquidated damages" provision; therefore, the Burke Entities certainly cannot be relying upon such document (which was limited a maximum payment from WMA of $300,000.00) to support their flawed claims against TV Service.

**2.      *The Burke Entities Cannot Assert Any Viable Breach of Contract Claim Under The WMA/TV Service Binder Agreement***

As established by the face of the WMA/TV Service Binder Agreement (attached to the Counterclaim at Exhibit 2) and by the undisputed record evidence, the WMA/TV Service Binder Agreement is a contractual agreement entered into directly ***between TV Service and G.***

---

[6]  NWE was undisputedly paid more than the $300,000.00 in "Broker Fees" referred to in the WMA/NWE Binder Agreement.  **See** Burke Dep. at 283:8-12.

***Sergeev/WMA***.   See WMA/TV Service Binder Agreement.  The record is absolutely clear that the Burke Entities are <u>not</u> parties to WMA/TV Service Binder Agreement, and that TV Service has no contractual obligations to the Burke Entities under the WMA/TV Service Binder Agreement. <u>See</u> Arman Dec. at ¶ 14; <u>see also</u> Burke Dep. 236:10-237:3. During his deposition, Burke testified that "this agreement seems to be ***solely*** between George and World Media Alliance and TV Service," and Burke expressly admitted that he was not a party to the WMA/TV Service Binder Agreement. <u>See</u> Burke Dep. at 236:10-237:3 (emphasis added).  "As a general rule, a person who is not a party to a contract cannot sue for a breach of the contract even if the person receives some incidental benefit from the contract." <u>Greenacre Props., Inc. v. Rao</u>, 933 So. 2d 19, 23 (Fla. 2d DCA 2006); <u>see also</u> <u>Preve v. Albert</u>, 578 So. 2d 33, 34 (Fla. 4th DCA 1991) (reversing a breach of contract finding because the appellant did not sign the contract and thus was not a party to the contract).

In addition to the undisputed fact that the Burke Entities are not parties to the WMA/TV Service Binder Agreement, it is also clear that the Burke Entities' breach of contract counterclaim cannot be based upon the WMA/TV Service Binder Agreement because there are clearly no material terms under such agreement which obligated TV Service to pay any monies to the Burke Entities (and certainly not the $1,350,000.00 being sought by the Burke Entities as liquidated damages). <u>See</u> WMA/TV Service Binder Agreement.  In fact, the only amount to be paid pursuant to the WMA/TV Service Binder Agreement was the $300,000.00 refundable binder payment that TV Service undisputedly ***paid in full*** to G. Sergeev/WMA, who were the actual parties to the contract. <u>Id</u>.  TV Service undisputedly paid more than the $300,000.00 referred to in the WMA/TV Service Binder Agreement, so there is nothing that TV Service has failed to do (or could have failed to do) under such agreement, and the Burke Entities certainly

cannot rely upon such agreement to assert the damage claims against TV Service for more than $300,000.00. See Burke Dep. at 283:8-12.  See Glover v. Gentiva Health Servs., Inc., Case No. 6:10-cv-1619-Orl-28KRS, 2012 WL 1389624 at * 3 (M.D. Fla. Apr. 20, 2012) (granting summary judgment on grounds that "Plaintiff has failed to show that Gentiva breached the settlement agreement in any way and that even if it did, Plaintiff has failed to show that she suffered any damages as a result of such a breach.")

Finally, as reflected in the Counterclaim, the Burke Entities are seeking to recover substantial "liquidated damages" against TV Service in the amount of $1,350,000.00. See Counterclaim.  The WMA/TV Service Binder Agreement does not even contain any "liquidated damages" clause, and since the binder was limited to a refundable payment to G. Sergeev/WMA of $300,000.00, the Burke Entities cannot be relying upon such document to support their flawed claim for damages. See WMA/TV Service Binder.  Accordingly, the undisputed facts and the governing law dictates that the Burke Entities cannot rely upon the WMA/TV Service Binder Agreement as the basis to assert any breach of contract counterclaim against TV Service.

**3.     *The Two Artist Engagement Proposals Attached to the Counterclaim as Exhibits 3 & 4 Are Not Enforceable Contracts Against TV Service, But Are Merely Non-Binding Proposals Which Have Undisputedly Not Been Signed or Accepted By The Authorized Representatives***

In furtherance of their flawed effort to assert a breach of contract counterclaim, the Burke Entities also make reference to and attach two inherently inconsistent and non-final proposed "Artist Engagement Agreements" that were unilaterally prepared by the Burke Entities, but that were never accepted nor executed by the necessary authorized representatives for the proposed parties to the agreement.  See 12/16 Proposal and 1/10 Proposal attached as Exhibit 3 and Exhibit 4 to the Counterclaim.  As detailed below, the undisputed facts (including Burke's own testimony) clearly establish that these proposed "Artist Engagement Agreements" are merely

potential offers/proposals that required the formal acceptance, approval and execution by Lady Gaga and/or an authorized representative of Lady Gaga.  See Burke Dep. at 203:4-204:13; 226:1-19; see also Arman Aff. at ¶¶ 18, 19.  A review of the two artist engagement proposals illustrate that neither of the documents are fully executed documents, and the proposals are clearly non-operative proposals, not enforceable agreements.  See 12/16 Proposal and 1/10 Proposal. Furthermore, the faces of the two proposals illustrate that the proposed material terms are entirely different between the 12/16 Proposal and the 1/10 Proposal; thus, the varying proposals, themselves, illustrate that there was clearly no "meeting of the minds" as necessary to create an enforceable agreement.  Id.

> ### a.      The 12/16 Proposal Is Merely A Non-Final Proposal And Unaccepted Offer That Does Not Constitute An Enforceable Agreement

With respect to the 12/16 Proposal (attached to the Counterclaim as Exhibit 3), a careful review of the document and the record evidence establishes that this document is undisputedly a non-final proposal and that it does not constitute an enforceable contract.  On its face, the document also reflects that it was not executed or agreed to by any authorized representative of Lady Gaga which is a prerequisite to the formation of any proposed contract.

It is well settled that "where the allegations of a complaint are contradicted by the specific facts revealed by an attached exhibit, the plain language of the exhibit will control and the conclusory allegations of [the] complaint are not admitted as true."  See Chastain v. N.S.S. Acquisition, Corp., No. 08:801260-CIV-HURLEY, 2009 WL 1971621 at *5 (S.D. Fla. July 8, 2009).  Florida law is clear that "an unaccepted offer cannot form the basis of an enforceable agreement."  See Largaespada v. Largaespade, 920 So. 2d 645, 646 (Fla. 3d DCA 2005); see also Irby, 901 So. 2d at 305 ("We agree with the trial court that the undisputed facts show that the alleged agreement was not more than a proposal lacking numerous essential terms and therefore,

was not an enforceable contract.")  The established law in Florida is that "'[a] written document, complete on its face and delivered to one of the signatories, does not become an enforceable contract if it was delivered subject to a condition or with a reservation until that condition is satisfied.'"  See Southern Internet Sys., Inc. v. Pritula, 856 So. 2d 1125, 1127 (Fla. 4th DCA 2003) (reversing trial court's order "[b]ecause no valid and enforceable contract existed between the parties"); see also Carson v. Fishtail Marine of Naples, Inc., 697 So. 2d 1222, 1224 (Fla. 2d DCA 1997) (affirming final summary judgment "because there was no enforceable contract until all of the conditions were satisfied" and the condition left unsatisfied "was an inspection by the Coast Guard and their approval of the boat for commercial use").

The record evidence establishes that the 12/16 Proposal was merely one of several constantly changing, non-final proposed "Artist Engagement Agreements" that were being circulated in connection with the discussions regarding the proposed effort to have Lady Gaga perform at the MUZ Awards in Moscow, Russia on June 1, 2012. See Arman Dec. at ¶ 18; see also 12/16 Proposal and 1/10 Proposal.  Significantly, during his deposition, Burke conceded that this proposed "Artist Engagement Agreement" was not signed by him or the Burke Entities, and that the proposals were not "operative" agreements until they were accepted and signed by someone that was authorized by Lady Gaga or her exclusive agent.  See Burke Dep. at 203:4-204:13; 226:20-228:1; 241:13-15; 248:23-249:2.

Furthermore, both Burke and Troy Carter specifically testified that the 12/16 Proposal was never approved by Lady Gaga and that it was never signed by Lady Gaga or any of her authorized representatives.  See Burke Dep. 246:17-21; 248:20-249:2; See Carter Dep. at 81:8-11; 81:18-20.  Additionally, the 12/16 proposal was unilaterally prepared by the Burke Entities, and it was not even shown to or signed by any authorized representative of TV Service. See

Burke Dep. at 244:16-18; <u>see also</u> Arman Dec. at ¶ 22.  Accordingly, the law and facts are clear that the 12/16 Proposal is not an enforceable agreement, and the Burke Entities cannot rely upon the non-final proposal to support a breach of contract counterclaim.

> **b.      *The Subsequent 1/10 Proposal Is Merely A Non-Final Proposal And Unaccepted Offer And It Is Not A Valid Contract***

The Burke Entities further undermine their own efforts to suggest that there was a valid contract between the Burke Entities and TV Service by attaching the 1/10 Proposal which is another non-final proposal containing entirely different proposed material terms as compared to the 12/16 Proposal, and which was not accepted or signed by any authorized representatives. <u>See</u> 1/10 Proposal.

Importantly, on its face, the 1/10 Proposal is clearly <u>not</u> signed by TV Service or anyone purporting to sign on behalf of TV Service. <u>See</u> 1/10 Proposal.  Additionally, the undisputed facts establish that TV Service never even remotely accepted the proposed terms of the 1/10 Proposal.  <u>See</u> Arman Dec. at ¶ 25; <u>see also</u> 1/18/12 G. Sergeev e-mail (DEF138); Burke Dep. at 280:5-9.  To the contrary, in response to the 1/10 Proposal, G. Sergeev expressly informed Burke that the deal was "impossible" and "unacceptable."  <u>See</u> 1/18/12 G. Sergeev e-mail (DEF138).

Furthermore, as with the 12/16 Proposal, the 1/10 Proposal was also merely a non-final offer/proposal that needed the express approval of Lady Gaga and/or her authorized representatives and the signature of one of her authorized representatives.  <u>See</u> Burke Dep. at 226:20-228:1; <u>see also</u> Arman Dec. at ¶ 19.  The 1/10 Proposal was signed by Kimone Love (who was Burke's cousin working at NWE) whom the undisputed facts establish had no authority to enter into any contract on behalf of Lady Gaga.  <u>See</u> Burke Dep. at 278:17-24; <u>see also</u> Carter Dep. 84:17-85:2.

Accordingly, the 1/10 Proposal is clearly not a valid contract between the Burke Entities and TV Service, and the inclusion of the 1/10 Proposal in the Counterclaim only serves to further negate the Burke Entities' flawed efforts to suggest that the 12/16 Proposal was an agreement.

   **c.**  ***The Defective Counterclaim For Breach of Contract Also Fails As A Matter of Law Because There Was Undisputedly No Meeting of The Minds And The Counterclaim Does Not Even Allege That TV Service Breached Any Actual Terms of the 12/16 or 1/10 Proposals***

Under Florida law, "[a] valid contract requires offer and acceptance." Jovine v. Abbott Labs., Inc., 795 F. Supp. 2d 1331, 1341 (S.D. Fla. 2011)  Further, "[w]ithout assent or the meeting of the minds as to the essential terms contained in an offer, there is no valid acceptance." Grant v. Lyons, 17 So. 3d 708, 710 (Fla. 4th DCA 2009).  The law is clear that "'without a meeting of the minds of the parties on an essential element there can be no enforceable contract." Duck Dog, L.C. v. Brownstar Props., 990 So. 2d 525, 529 (Fla. 2d DCA 2008); see also Irby, 901 So. 2d at 306 ("To be enforceable, an agreement must be sufficiently specific and reflect the agreement by the parties to all essential terms."); DirecTV, Inc. v. Dacken, No. 8:03-CV-882-T-17MAP, 2005 LEXIS 48166 at *8 (M.D. Fla. Apr. 8, 2005) ("[P]reliminary negotiations or tentative and incomplete agreements will not establish a sufficient meeting of the minds to create an enforceable settlement agreement.")

As indicated above, the 1/10 Proposal contains entirely different terms than the 12/16 Proposal, including that the proposed performance would take place on October 9, 2012 (rather than June 1, 2012), and that the proposed price would be $3,500,000.00 (rather than $2,300,000).  Thus, the documents attached to the Burke Entities' Counterclaim establish that the proposed material terms in the proposal were varying and non-final terms, and that there was undisputedly no "meeting of the minds" as necessary to create an enforceable agreement.  See 12/16 Proposal and 1/10 Proposal; see also Arman Dec. at ¶ 20.

Finally, in addition to the fact that the 12/16 and 1/10 Proposals are not enforceable contracts, the Counterclaim is also fatally flawed because the Burke Entities do not even allege (and cannot allege) that TV Service breached any actual terms set forth within the proposal documents.  See Counterclaim.  To the contrary, in an effort to suggest that TV Service breached some type of contractual obligation, the Burke Entities only make reference in the Counterclaim to an "exclusivity" provision contained in the WMA/TV Service Binder Agreement (which is an agreement that the Burke Entities are not parties to).  See Counterclaim at ¶¶ 11, 15.  Notably, the 12/16 Proposal and 1/10 Proposal do not contain any "exclusivity" language whatsoever (see 12/16 and 1/10 Proposals), and the Burke Entities certainly cannot be permitted to borrow contractual provisions from contracts to which they are not parties in an effort to establish a breach claim against TV Service.  Thus, to the extent that the Burke Entities are attempting to rely upon the 12/16 Proposal or the 1/10 Proposal for their breach claims, such claims must also be dismissed because the Burke Entities have not alleged (and cannot allege) that TV Service breached any material terms of the 12/16 and 1/10 Proposals.

**B.**     ***Summary Judgment Must Be Granted Because The Burke Entities Cannot Recover Liquidated Damages As A Matter of Law.***

As reflected in the Counterclaim, as part of their efforts to improperly impede the release of the remaining $1,050,000.00 of the Frozen Funds to TV Service, in the demand for judgment, the Burke Entities unjustifiably demand judgment for "***liquidated damages of $1,350,00.00 compensation*** and punitive damages in additional to all interest, costs and attorney's fees and all other relief permitted by law." See Counterclaim (emphasis added).  Notwithstanding the absence of a valid enforceable agreement between the Burke Entities and TV Service, in an effort to support their outrageous damage claim, the Burke Entities are attempting to rely upon

the facially unreasonably "liquidated damages" provisions contained within the 12/16 Proposal and the 1/10 Proposal.

Importantly, Florida law is clear that sums which are grossly disproportionate to any damages that could have been anticipated by a breach constitute an unenforceable penalty.  See Burzee v. Park Ave. Ins. Agency, Inc., 946 So. 2d 1200, 1202-03 (Fla. 5th DCA 2007); see also McNorton v. Pan American Bank of Orlando, 387 So. 2d 393, 397 (Fla. 5th DCA 1980) (retention of fifty percent of the purchase price paid as a deposit was "sufficiently shocking to state a cause of action" for its recovery); Air Caledonie Intl. v. AAR Parts Trading, Inc., 315 F. Supp. 2d 1319, 1344 (S.D. Fla. 2004).  "One significant factor in determining unconscionability is the amount of money being retained vis-a-vis the total contract price." See Berndt v. Bernstein, 465 So. 2d 1264, 1265 (Fla. 2d DCA 1985).

In the instant case, the purported damages the Burke Entities would have suffered as a result of a breach could be easily calculated in this case as the profit it would have retained had the engagement of Lady Gaga actually been secured.  Burke testified that the total amount that the Burke Entities would have obtained from the proposed transaction would have been approximately $300,000.00 and the other monies received were going directly to Lady Gaga. See Burke Dep. 164:8-17; 284:11-285:2; 322:22-323:6. The record reflects that Burke Entities have already obtained and used for their own benefit $450,000.00 of the $1,500,000.00 which they received in connection with the proposed transaction. See Joint Motion (D.E. 5); see also Burke Dep. 168:14-25; 323:21-324:3.

As such, in the instant dispute, the Burke Entities' request for the retention of $1,350,000.00 as "liquidated damages" is grossly disproportionate to any damages that the Burke Entities could even claim that they have suffered.  Accordingly, in addition to the fact that the

Burke Entities cannot establish any viable breach of contract claim against TV Service for the reasons set forth above, the Burke Entities claim for retention of the $1,350,000.00 as "liquidated damages" must also fail, as a matter of law, because the undisputed facts establish that an amount of $1,350,000.00 in liquidated damages would clearly constitute an unenforceable and unreasonable penalty. See Burzee v. Park Ave. Ins. Agency, Inc., 946 So. 2d 1200, 1202-03 (Fla. 5th DCA 2007) (finding the "numbers are grossly disproportionate to any damages that Park could have anticipated by a breach, and, therefore, constitute a penalty.")

**C.     *The Burke Entities are Unlicensed Talent Agencies And Thus Any Purported Agreements To Secure Lady Gaga for a Performance Are Unenforceable and TV Service is Entitled to a Return of All Monies Paid***

Finally, in addition to all of the other grounds to support the entry of summary judgment against the Burke Entities, TV Service is also entitled to the entry of summary judgment because the Burke Entities are undisputedly operating and engaging in an unlicensed talent agency business, which serves to void any benefits obtained by the Burke Entities as a result of such unlicensed and unlawful activity.  Specifically, pursuant to Florida Statute Section 468.403, "[a] person may not own, operate, solicit business, or otherwise engage in or carry on the occupation of a talent agency in this state unless the person first procures a license for the talent agency from the department." See Fla. Stat. § 468.403(1). Additionally, "a person may not advertise or otherwise hold herself or himself out as a 'talent agency' or 'talent agent' unless the person is licensed under this section as a talent agency." Id.  The law is clear that unlicensed activity as a talent agency is a felony in the third degree.  See Fla. Stat. § 468.413(1)(a).

Furthermore, acting as an unlicensed agent renders any contract of the unlicensed agent void, and the unlicensed talent agency is not entitled to any commissions and/or profits thereunder.  See e.g. Vista Designs, Inc. v. Silverman, 774 So. 2d 884, 886 (Fla. 4th DCA 2001)

(holding that fee agreement with attorney who was not licensed to practice law in Florida was void and client was entitled to be reimbursed for legal fees paid under the void contract); see also Cooper v. Paris, 413 So. 2d 772, 773 (Fla. 1st DCA 1982) (reversing and remanding for entry of final judgment that unlicensed real estate agent return monies and explaining that "to refuse to return the monies paid would affront this Court's affirmative duty to see that the party violating public policy not benefit in any way as a result of his wrongdoing"); Preston v. Ferrer, 552 U.S. 346, 352 (2008) (holding the question of Preston's status as a talent agent relates to the validity or legality of the contract).  "The broad basis for the doctrine that contracts of certain unlicensed persons are unenforceable is that the courts should not lend their aid to the enforcement of contracts where performance would tend to deprive the public of the benefits of regulatory measures."  See Cooper, 413 So. 2d at 773 (citing Williston on Contracts, § 1765, p.246).

In the instant case, none of the Burke Entities are duly licensed talent agencies in accordance with the laws of the State of Florida.  Burke does not have a valid license, NWE does not have a valid license and VEW does not have a valid license.  See Florida Department of Business & Professional Regulation, http://www.myfloridalicense.com/dbpr/ (then "unlicensed activity"; then "verify a license") (last visited November 27, 2012).  Despite this lack of proper licensure, it is undisputed that the Burke Entities, including NWE **Talent Agency** and Management, Inc., d/b/a/ NWE **Talent Agency** and Management Company, are operating unlicensed talent agencies and holding themselves out as "talent agencies" in direct violation of Fla. Stat. 468.403.  See Fla. Stat. § 468.403(1); see also NWE Website.  Additionally, VEW's website provides that "it is a fully functioning Entertainment Company, including artists, songwriters, producers, **talent agency** & management company; music publishing; concert promotion & touring; film & television; new business ventures; and a music label."  See VEW

Website (emphasis added).  Accordingly, as unlicensed talent agencies, the Burke Entities are not entitled to any of the monies received in connection with their failed efforts to secure Lady Gaga for the MUZ Awards and, as a matter of law, TV Service is entitled to a return of the monies paid to the Burke Entities. See Cooper, 413 So. 2d at 773.

### III. CONCLUSION

For the reasons set forth herein, TV Service respectfully requests that this Court enter final summary judgment in favor of TV Service and against the Burke Entities, ruling that the Burke Entities' Counterclaim be dismissed in its entirety with prejudice, and ordering that the $1,050,000.00 of Frozen Funds pursuant to this Court's Order be immediately released to TV Service, and requiring that all other monies unlawfully obtained by the Burke Entities be returned to TV Service, and for such other and further relief as this Court deems appropriate.

 Dated: November 28, 2012

Respectfully submitted,

By: */s/ Michael G. Austin*
    Michael G. Austin
    Florida Bar No. 0457205
    Michael.austin@dlapiper.com
    Rachel B. Mervis
    Florida Bar No. 086147
    rachel.mervis@dlapiper.com
    DLA PIPER LLP (US)
    200 South Biscayne Boulevard
    Suite 2500
    Miami, Florida  33131
    Telephone: 305.423.8522
    Facsimile: 305.675. 6366

Jonathan D. Siegfried
New York State Bar No. 1237908
jonathan.siegfried@dlapiper.com
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York, 10020-1140
Telephone: 212.335.4925
Facsimile: 212.884.8477
*Admitted Pro Hac Vice*

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via CM/ECF electronic notification on November 28, 2012 upon Robert A. Rosenblatt, Esq., The Rosenblatt Law Firm, 7695 S.W. 104th Street, Second Floor, Pinecrest, Florida 33156, *counsel for the Burke Entities* and via regular U.S. mail to George Sergeev, 16711 Collins Avenue, Apt. 2004, Sunny Isles, FL 33160.

*/s/ Michael G. Austin*
Michael G. Austin